Good morning, your honors. My name is Jixian Li. I'm representing the petitioner. In this case, the PIA found that the petitioner provided insufficient evidence to show that his fear of persecution is well-founded. And it is undisputed that in this case that the petitioner has satisfied the subjective reasonableness of his fear of persecution because the PIA has specifically found the petitioner to be credible. The only issue remaining before this court is whether or not the fear is objectively reasonable. Now, we submit to the court that a reasonable fact-finder in this case is compelled to make a finding that the petitioner's fear of persecution is objectively reasonable. And the record indicates that the petitioner has a long history of engaging in activities opposing the totalitarian political system in his home country. As early as in 1979, the petitioner formed a so-called study group critical of the Chinese political system, and he engaged in pro-democracy activities in Saipan after the 1989 Tiananmen Square student-led demonstrations. And most recently, in 2001, the petitioner joined the overseas Chinese Democracy Coalition in Guam. In this case, the petitioner does not claim that he suffered past persecution, but there is a well-founded fear of future persecution. Even though the petitioner himself has not suffered past persecution, but those who are similarly situated as the petitioner have been victims of past persecution. For example, one member of his so-called study group was arrested and sentenced to labor camp for five years for writing an article critical of the Chinese pro-democracy activities, was arrested immediately upon his return to China. And a third person, the record also shows that a third person was arrested after returning to China simply because he was a member of a pro-democracy organization outside of China. So based upon what had happened to those who are similarly situated, as petitioner, a reasonable fact finder in this case, would be compelled to conclude there is at least 10% chance that the petitioner would be persecuted. What is his wife's status? Yes, his wife was granted asylum, full asylum, because the real ID did away with the 1,000 per year quota, and also the population control. The wife was granted asylum conditionally based upon her claim under the coercive population control in China. And then last year, in May of last year, the real ID did away with the quota, with the condition. So the wife actually did apply for derivative asylum on behalf of petitioner. I already discussed this issue with the council for the government. We are kind of hesitant to have this case pulled out of the calendar, because first of all, even though actually the I-730, that's the CID relative petition was granted, but there was an error in the grant. And so it may take years for the error to be corrected. And secondly... What's the error? The error was the CID thought that the petitioner, the beneficiary, so that's the husband, the petitioner in this case, was outside of the United States. So they sent out an approval notice to the American consulate in China. And secondly, your honor, the derivative SID status is not the same as SID in his own right. Because if the wife, for example, if the wife loses her status, then the husband will lose his status as well. And what if the marriage is not going to work? And if there's a divorce, then the petitioner in this case will also lose his SID, the derivative SID status. Do they have children? Yes, they do have one U.S. citizen child. They have a U.S. citizen child, and isn't it just kind of a supposition that they might get divorced? I mean, there's nothing in the record right now that would suggest that, is there? No, no, no, no. I mean, just... They're just talking. Yes, yes, your honor. So that's why the court prefers to have this case put through mediation, and I'm open to that suggestion. But it's our position that the petitioner wants to have SID in his own right, but not through the wife. I don't quite understand what the effect of this mistake is. Did they grant him asylum also? No, they just approved the petition, the SID relative petition. So the petitioner at this moment has not been granted derivative SID status yet. He has been granted? No. No, it's only the petitioner. The petitioner only recognized, it's more like an I-130 petition, they only recognized the bona fide spousal relationship in this case. So the approved petition has been sent out to the American consulate in China to process. Approved for what? The approved I-730, that's the petition for relative, for SID relative. Oh, so you petitioned the American consul to approve the derivative petition? Yeah, they approved that, but the petitioner has not been granted derivative SID status as of yet. And as I said, even though he is granted derivative SID status, we would still prefer that, if possible, he would be getting SID status in his own right, as the reasons that I just alluded to. And also, the BIA in this case concluded that the petitioner's fear of persecution is not well-founded for only two reasons. First, that he returned to China in 1982 and remained there unharmed for that period. And secondly, that the petitioner has never been directly threatened by the Chinese authorities. For this first reason, Your Honor, the BIA has completely ignored the fact that most events giving rise to petitioner's fear of persecution occurred after the year of 1982. Do you want to say something? Yes, Your Honor. Thank you. Stacey Paddock again on behalf of the Government Respondent Attorney General. I'd just like to clarify one issue about the derivative asylee status. When I arrived at court, I spoke with opposing counsel and inquired whether, in fact, because the wife had been granted asylum based on the population control program in China, and in fact, the Real ID Act of last year eliminated the cap on the number of individuals granted conditional asylum based on the CPC regulations. That cap had been lifted. Whether the wife's asylum application had, in fact, been granted, because there's a backlog of processing all of those conditional grants. He said, yes, it had been granted. I asked whether he had filed a Form I-730, which is when an individual applies for asylum and does not in the application include the basically make a visa petition type of application to include staff or children as derivatives of the application. It must be done within two years of the individual being granted asylum. Opposing counsel informed me, yes, he had, in fact, done that. Yes, it had, in fact, been granted. However, there was a processing error. Under the pertinent regulation, which is 8 CFR 128.21C, there's a provision for family members that you want to include as derivatives that are in the United States and family members that are outside of the United States. As I understand from opposing counsel, the error is that CIS, which is part of the United States. I told opposing counsel to make a PDF of the approval notice, email it to me, and I will send it directly on to OPLA headquarters to try to correct the problem as quickly as possible so that that avenue for asylum for petitioner should hopefully become a reality much quicker. So I just thought I'd clarify that. Now, once he was to receive that derivative status, is his derivative status dependent on his staying married? Yes. What happens is once someone's granted asylum, they must wait one year before they can apply to adjust status to that of a lawful permanent resident. Many asylees don't follow along with that process and jeopardize losing the asylum status. However, after one year, anyone who, basically anyone who's granted asylum, even derivative asylum, can file for all the conditions of being admissible, and then most are, everyone that is admissible can adjust to that of lawful permanent resident. Once he were to adjust, if something happened, they got divorced, let's say, on speculation, it would have no effect because he's already a lawful permanent resident. So there really isn't any meaningful difference between the two statuses? It's my understanding that during that temporary asylum grant period, before adjusting to LPR status, there is a risk that if the relationship that creates the derivative status is severed, there's a problem. However, the regulations also provide that if that status is lost, it permits the individual, based on a timely filing, to seek asylum in their own right. So it could be that this entire issue could be renewed if that status is severed prior to adjusting to lawful permanent resident. What's the, you said timely, what's the time, in other words, wouldn't he be at risk if something went wrong with his present asylum? Yes, he could be. The timeliness that I spoke of is when an individual who's a derivative realizes that the relationship creating that derivative status has severed, the regulations just state that in a reasonable amount of time, they must file for asylum in their own right. Reasonable, of course, is only defined by the courts. Now, he's already done that, and he's got an adjudication at the BIA level, at least. He's not going to be able to renew an asylum claim on the same grounds. He's got to win here or not, doesn't he? Well, I believe he's got a parallel track going. If he accepts, if he's granted derivative asylum status, I believe it makes this claim moot because he already has been granted asylum. That, I think, was his point. I think he's saying it's not really moot because an asylum status in my own right would be without risk during that one year or longer if there's something delayed in his application for permanent residence. Correct. It's truly moot in that sense. He's trying to get something more here than he would get by derivative status. And it would, honestly, it would be that for the one year period prior to being eligible to apply for adjustment of status, that's the only difference. He has asylum in his own right. It's for that one year period before he's eligible to apply. That's the only difference. Now, regarding the merits of his claim, Respondent Attorney General contends that the evidence does not compel a contrary conclusion that he failed to meet his burden of proof in this case. There's several different sets of experiences that Petitioner has. The earlier experiences from 1971 to 1979, when he was in the study group, the Board of Immigration Appeals found that when he returned in 92, any subjective fear he had related to those occurrences are diminished because You mean in 82? Okay, when he returned in 82. Then, regarding the most recent experiences, since he was in Saipan, the evidence of record shows that in 81 he went to Saipan, then in 82 he came back because he missed his family, and then again returned to the United States in 1983. That's Saipan. Oh, sorry. I apologize. He left China for Saipan in 81, and then returned in 82 or 83, and then was living in Saipan at the time the Tiananmen Square, June 4th, broke out. He stated that he wrote letters, he commemorated the event when in Saipan, and then in 1990 he applied for asylum in Canada, but did not follow through on that process. And then in 1995 his father died, and he claimed that he was warned not to return home in 95, so he didn't. And then he stated in 1999 a friend returned to China and again warned him that he should not return home. In 2000 he moved to Guam, and in 2001 claimed that he became a member of the Overseas Chinese Democracy Coalition, that with that organization he chatted online and on internet sites, he visited, I see my time is up, may I? Thank you. That he visited a Falun Gong delegation or greeted them at the airport, and that they've also commemorated the June 4th anniversary of the student movement. He has not demonstrated or provided any specific documentation to show that the activities in Guam since 2001 have been at issue or noticed or are a reason why anyone in China would be looking for him. Didn't he have some activities while he was on Saipan, and was there not an individual there who was reporting to China about the activities? Yes, that appears to be the basis of how anyone in China knows anything that he's done, and would be the basis for any claimed fear of future persecution, and that is the testimony reveals that he was living in a Chinese state-sponsored housing facility in Saipan, and he claimed that his neighbor or roommate was an informant or data collection officer, and became aware of the 1990 asylum application in Canada. Then on the other side, in China, regarding how his family became aware of some sort of warning, he stated that a family friend, who he initially introduced him to the Communist Party, told his family that, I understand that he's applied for asylum, or has done certain activities that are anti-revolutionary, and that he should be careful when he comes home, he should just surrender himself to the Communist Party. That is the only testimony, evidence, information we have that anyone has noticed or is looking for him, or anything. That's the basis of his well-founded fear of persecution, is that a friend told his family this. There's been no visits by cadres. There's been no continuing, ongoing evidence that he is being sought after. And in fact, every year his permit, when he lived in Saipan for 19 years, his permit had to be renewed every year. He continued, was allowed, despite the informant knowing that he had done this, he was allowed to continue to live in that Chinese state housing. The fact that a friend of his returned and was arrested in China, we don't know why. We don't have the full story. And in addition, the friend that was arrested back in 1979, 1980, in fact he was arrested in 1982. I believe from the testimony he had a passport, but that it has not been renewed. He stated that he attempted to get it removed, pardon me, not removed, renewed, and that there was some ineligibility, but we don't know what that is. So currently he does not have a valid Chinese passport. That's what the record shows. But the record also shows that he has used his name, continued to live in the Chinese facility, and has been renewed his visa on his actual name. Any more questions, Your Honor? First of all, I want to say this, and this is my own opinion, that you are really a true public servant. You really exemplify the best that I've seen concerning attorneys who represent the government in these immigration cases. You've been very helpful, and you've offered to help the two attorneys who were here this morning before us, and I appreciate that very much. And, you know, these immigration cases are difficult, and our laws on immigration are so complicated that I think in many ways they're more complex than the Internal Revenue Code. And so I'm happy that you're here. Thank you. And I'm pleased that you're going to sit down with counsel on both of these cases and give them some advice. And that's what you intend to do, is it not? Yes, sir. Okay, and guidance. And then it would be nice, I suggest that when you're through, you send a copy of what, you know, just summarizing what course you suggest that they follow. Sort of a status report to the court? Sort of a status report, yes. And so I commend you for your good work. Thank you very much. And that'll pass out. It'll come down to me. Thank you. Thank you very much. In conclusion, Your Honors, the Respondent Attorney General contends that Petitioner failed to meet his burden of proving a well-founded fear in China and that substantial evidence or record does not compel a contrary conclusion. Thank you. You know, I want to say one other thing. In both of these cases, there are children born in this country. And I find it very painful and I find it un-American to arrest children who were born here and take them away from this country and send them somewhere else. There's just something, I think, that's immoral about that. So I just make that statement. And actually, Your Honor, if you don't mind, one more comment. Sure. Regarding not this case, but the Jin case, the first case that we discussed, one of the first things I did was to determine whether, in fact, Petitioner was eligible to apply for cancellation of removal. And unfortunately, he's ineligible based on the time, I have my notes over there, the 10 years. He unfortunately misses the 10 years by two and a half months, which is heartbreaking. But I did investigate that as well. And unfortunately, that avenue is not available. Thank you. Thank you very much. Thank you, Counselor. Do you want to add anything? Yes, of course, Your Honor. We submit to the Court, Your Honor, in this case, this one did provide a specific documentary evidence to show his fear of persecution is objectively reasonable. Respondent introduced into record that his membership card with the overseas, the overseas Chinese government, the Chinese Overseas Pro-Democracy Coalition. And also, Respondent, based on the background information and also the newspaper article, which indicates that there's a Chinese citizen who returned to China and who got arrested immediately for being a member of an overseas democracy organization. So, especially the country report from the Chinese government, the Chinese government supports the reasonable, the objective reasonableness of a prisoner's fear of persecution. According to the State Department's country report, it says that the citizens in China who sought to express openly dissenting political and religious views continue to live in an environment filled with repression. And in this case, the record is clear that Respondent, a prisoner has a long history of expressing openly his anti-government political opinions. And most recently that he publicized his view, his critical view on the Chinese government through the internet. So, therefore, the article make a finding that Respondent's prisoner's fear of persecution is objectively reasonable. And we urge the court to grant this petition for review and reverse the BIA's finding. Thank you. All right. So, I thank you, Mr. Li. I'm glad that you and Mr. Kinnunen will be meeting with Ms. Paddock. All right. Thank you very much. The two cases are submitted.
judges: Goodwin, B. Fletcher, Fisher